The next argument is in Appeal No. 05-1515, Metronic, Inc. Mr. Basket, good morning. Welcome. Please proceed. Good morning, Your Honor. May it please the Court. Before I address the merits of the reissue-recapture case, I want to address the jurisdictional issue in light of the fact that the Supreme Court, after the briefs were completed, granted certiorari to review the very issue that the Court might perceive in this case. We've suggested that this declaratory judgment action by a licensee does meet case and controversy requirements even under this Court's precedence. The cause of the presence of an escrow prior to the litigation into which more than $5 million have been paid and the distribution of that escrow depends on the resolution of the patent issue. And we believe that is a viable distinction and is suggested by the Court's prior cases. So you're saying even if the Medimmune case stands before the Supreme Court as it was decided here, you get around that problem? It's a different issue. And with respect, we rest primarily on Cortis II, not the Cortis case that you're going to consider in Senate Court, which is Cortis I. But in Cortis II, we're in a dispute between Medtronic and Cortis. A panel of this Court found that there was case and controversy jurisdiction in circumstances in which there had been an escrow, court escrow, if you will, rather than voluntary escrow. But in both cases, the escrow provision just highlights that Medtronic in this case is no longer paying the royalties, which has been a point emphasized in all of the recent decisions, finding no jurisdiction. But the royalties are in an escrow. The outcome determines whether you're paid. But what I would suggest is that in light of the Supreme Court's grant of cert in the case, and it will be argued next fall sometime, we suspect, early in the term, if the Court does not accept our differentiation based on the escrow, that it really is based with two options, and we think there's one that's clearly preferable. One option would be to hold this case pending the Supreme Court's determination and its ruling sometime late 2006, early 2007 on the merits. The second one would be to go ahead and, if the Court does not accept our distinction, issue an opinion that would vacate the decision below, in which case we would have a cert petition pending. And then the case, if cert results in a reversal, would come back here when the oral argument on the merits would then be the only issue before the Court. Well, you have problems other than jurisdictional in this case, right? Well, of course. And what about claims 15 and 16? The problem here with respect to those claims is that they were allowed in the beginning. They weren't rejected. And so there wasn't any amendment during the course of the thing that clearly related to distinguishing prior art. And then you had the examiner's amendments at the end of the process. Why should we assume that the examiner's amendments at the end of the process under those circumstances were directed to patentability? Two reasons. The first is the examiner's statement on the record invokes the classic line groups that examiners use when they have patentability issues in order to put the case in a position for liability. The second is that in the history of the prosecution here, it's very clear that throughout the prosecution there were repeated rejections of claims based on the prior art, which the examiner had concluded only allowed patenting of something that was in essence the conditional mode. And those precise words aren't used, but that's what the thrust of all the arguments are. It is a confusing prosecutorial record in that sense, but we don't think it's ambiguous at all. Because it is clear to us that in reading the entirety of the record, the examiner has second thoughts. And whatever transpired in that oral interview, which is not in the summary, there has to be some substantive patentability reason for adding 39 words to a claim. Virtually doubling the length of the claim simply cannot be minor wording changes. You can't look at that amended claim and say that it means the same thing. Chief Judge Robinson found that too. Well, the problem is in these recapture cases that it's not always clear why something is being done. In the prosecution history estoppel context under FESTA, we assume that amendment is for reasons of patentability. Should we apply that same presumption here? Just like we suggested in the brief that it would be appropriate to do that. The court has never addressed that issue specifically, as you know. But in looking at all the estoppel cases and at the reissue recapture cases, it's very clear to us that reissue recapture is a part of an estoppel body of law, if you will. And the Hester case specifically says that, if you look at estoppel principles as it has developed in other areas of this court's jurisprudence on claim construction. It's the same sort of concept, and you draw the same sort of references. From a public notice standpoint, we submit that it is very sustainable to conclude that in reissue recapture, if there is an otherwise unexplained acceptance of an examiner's amendment that changes scope, which is what we have here. That it's a presumption that that's a surrender for patentability reasons, calling into play all the FESTA procedures as to what is a rebuttal. Mr. Bass, let me ask you. I have two questions. One, I just very quickly, and I won't tie you up on this, I just want to confirm. You're asking us, in view of the Supreme Court having taken metamune v. Genentech, you're asking us to hold off on a decision on this case, correct? That's one option. I think, actually, what might be more efficient in terms of the court's deliberative process would be to go ahead, if you don't accept our argument, and issue your decision. Let us take cert. Let the case be held there. But either way, don't rule on the merits. Well, you couldn't. You couldn't. I mean, if you concluded that we're wrong on the escrow issue, it's a jurisdictional… Okay. Now, getting to the merits, as I understand the recapture law, one of the things you look at, I mean, it seems to me that, correct me if I'm wrong, it seems to be accepted in the jurisprudence that one reason to allow, or one defense against, one argument against a recapture defense of the kind you're making is that there was attorney error here, good faith attorney error. And Judge Robinson, in her opinion, and the record supports it, I think, lays out a pretty good record, if you will, of this, what I'll call this three-ring dialogue between Mr. Mauer, Mr. Cohn, and Mr. Nikolai, showing that Mr. Nikolai, and I think Mr. Mauer said in maybe his fifth declaration on reissue, there was a miscommunication, and as a result, he didn't appreciate that I was really after the unconditional claim, unconditional triggering. What do you say to that? There does seem to be good record for attorney error here. Well, there's, I think, an area in the whole recapture doctrine that has perhaps not been explored in fine detail, as the question puts it, because the case law is explicit that you can't just have a good faith attorney error and get a recapture, because the public notice aspect of the whole doctrine absolutely precludes even a clearly erroneous good faith attorney error from justifying a recapture if there was indeed a surrender in the original prosecution of Scope. Even if it was a good faith error, it's precluded. So you would say, Mr. Mast, let's assume that the Cohn-Nikolai-Mauer dialogue shows good faith. Nevertheless, there was recapture of a claim that was barred by prior art. That's correct. Now, that gets you to, I guess, the Nafoltz, Cohn, and Rockland discussions that took place before the PTO, and what is your argument for the proposition that that was speaking to conditional, unconditional? It was speaking to both. We submit that the dialogue constantly, from the examiner's standpoint and from Mr. Nafoltz's standpoint, contained two differentiations, one of which was conditional-unconditional, the other of which was univentricular-biventricular sensing. And we think it was clear Chief Judge Mischel's opinion recently made it clear that if you've got a dual argument, the dual argument can sometimes serve as a basis for an estoppel against a dual element, sometimes serve as a basis for an estoppel against each element separately. Looking at the totality of the prosecution history, we think this is a case where the arguments advanced and the responses advanced were dual distinctions, one of which was conditional-unconditional. And the only way to read this change is the way Chief Judge Robinson read it, and that was that it was a change in scope which changed a claim that was conditional and unconditional into a claim that was conditional only. But if I understand you correctly, you're saying even if the amendment wasn't designed to avoid the prior art, that the fact that the argument was made about the conditional-unconditional mode in relation to the prosecution history, even if it related to other claims other than 15 and 16, would be sufficient? We believe that's established case law, that you can surrender by argument even scope that you have never claimed because it constitutes an estoppel. And that's true in the DOE context as well, but it certainly should be true in re-issue. Let me explain why. I think there's a very clear line that practitioners ought to be following, particularly in light of the Johnson v. Johnson situation. In the circumstances presented, Mr. Nikolai had a choice. He could either have done nothing, as he did, or he could have filed a response to the examiner's statement saying we don't think that amendment is necessary to obtain patentability because we think it's allowable even without the amendment, but we'll accept it, we'll acquiesce in it for purposes of convenience to get a patent now, and then file a continuation application to go ahead to prosecute the claims without the amendment. Instead, what they did was to wait two years, and then come back and try to remove from the issued patent the precise language that the examiner had put in as a condition of allowability. That has got to be a classic case of prohibited re-issue recapture, because if the public notice policy behind the whole body of law means anything whatsoever, it means that a party can't come in, acquiesce silently in a scope change as dramatic as this one was, and then come back in, claim good faith attorney error, and establish a recapture of precisely that which was surrendered because the examiner found it necessary to have a patent. What do you say was the reason for patentability that triggered what I'll call in the amendments of Claim 15 and 16 the critical in-the-event language? We think the reason for patentability was prior art, that the same prior art that had been discussed before, properly read, established that the unconditional mode was not patentable. Just one last question. Maybe I should know the answer to this. If I should, I don't. I apologize. If you have five claims in a patent, and one of them falls under the recapture doctrine, is it just that claim that goes out, or the whole patent? It's the scope that goes out, not the claim specific. The scope surrendered here was the unconditional. Okay. If I could reserve the balance. Very well. Thank you. Mr. Neustadt? Thank you, Your Honor. Good morning. Welcome. Good morning, Your Honor. Do you agree that during the prosecution here that the applicant argued a number of times that the prior art wasn't pertinent because it didn't show the conditional embodiment? Yes. All of the arguments in the original application were with respect to conditional embodiment. In fact, the testimony of everyone was that they were all considering the conditional embodiment. Mr. Nicolai, the inventor, didn't even realize the unconditional embodiment because he said he didn't even claim it. So he didn't intend to do anything except argue conditional embodiment. But if we were to accept Judge Robinson's determination that in the course of the prosecution that the claims were narrowed, so they only covered the conditional embodiment, then wouldn't it be sufficient to create a recapture situation that the applicant here continuously distinguished the prior art as not involving the conditional embodiment? No, it would not because everyone who was involved in the prosecution was prosecuting the conditional embodiment. They all thought it was the conditional embodiment. Even the examiner thought it was the conditional embodiment. The examiner, when he made the changes, and this is at a telephone interview, no prior art is discussed. The examiner had already allowed the claim in the first office action, so there's no mention at all about him going back and changing that. And he looked at that claim and he sees, well, maybe I ought to put some more limitations in to make this more clearer with respect to exactly what is happening. And their expert, an electronics expert, said the claim, 15 and 16, before it was amended by the examiner was smart, meaning that it was the conditional embodiment. She said the examiner's change just made it smarter. And all that Judge Robinson did— So let's stick with the, not with these affidavits about what the prosecution meant, but with the actual prosecution. In the course of the prosecution, you agree that there was constant argument saying that the prior art didn't show a conditional embodiment, right? That's right, because they were arguing conditional embodiment. And primarily they were arguing a lot about whether or not you needed two sensors, a sensor in each electrode, and that's a requirement for the conditional embodiment, not a requirement for the unconditional embodiment. Okay, so why isn't it sufficient for recapture that there was a narrowing of the claims to the conditional embodiment and that at the same time there was argument distinguishing the prior art on the ground that it didn't show the conditional embodiment? Why isn't that sufficient, even if we conclude that the amendment wasn't shown to be for that purpose, the amendment to 15 and 16? I don't think there was a narrowing, because everyone considered— Yeah, but I'm asking you to assume hypothetically you're wrong about that and that Judge Robinson was right. I think Judge Robinson didn't even say that there was— Well, let's just assume— Yes. Let's assume that there was a narrowing amendment. I understand that you disagree with that, but assuming that there was a narrowing amendment, why isn't this argument that was made about the prior art not showing the conditional embodiment sufficient to invoke the recapture rule? Just go with me on the hypothetical. The answer isn't the same answer Judge Robinson gave, which is no surrender. Why not? Because there isn't any surrender, because everyone thought they were arguing about the conditional embodiment, and that's what Judge Robinson said, because even Judge Robinson, when she looked at it, she said, well, now knowing about the unconditional embodiment, maybe if I read this very broadly, I can see that it may have application to it, but no one read it that way, and there was no conscious surrender. There was no intent for a surrender, and she— But why can't you have surrender by argument, by saying that the prior art is different because we're claiming the conditional embodiment, which is what the applicant did here? Why isn't that sufficient to create a surrender by argument? Because they're talking about a surrender with respect to conditional embodiment, not with respect to unconditional embodiment. You can talk about surrender for conditional, but not with respect to unconditional, because no one is then talking about the unconditional, and so you can't have a surrender with respect to something they're not even talking about. In fact, Judge Robinson said in this decision that, however, a patentee cannot surrender through amendment what he never claimed to begin with. And then Judge Robinson also said on that that the examiner, when he said these are just minor wording changes, the examiner thought he was making minor wording changes, not surrendering embodiment. Yeah, but I thought Judge Robinson concluded that 15 and 16 originally covered the unconditional embodiment and were narrow. Is that correct? She said that 15 and 16, when read with her perspective, could now be seen, if you wanted to interpret them that way, to possibly cover it. But the language in there was the language of the conditional embodiment. They talked about many of the same words that you use for conditional embodiment, and everyone understood it that way. And so she just made that observation, and even after making that observation, she said, but there's no surrender here. There wasn't any thought at all that by making this change there was going to be a surrender. The examiner didn't think that, the Medtronics expert didn't think that, Dr. Moore didn't think that. But that's all extrinsic evidence. You have people coming in with affidavits and testimonies saying this is what we were thinking during the prosecution. That's not very valuable. We have to go on the recapture rule with the prosecution record, don't we? Aside from the good faith issue, which that's appropriate to go to extrinsic evidence. But in terms of the prosecution of the claims and whether a claim was broadened or narrowed, what is the subjective intent as described in affidavits coming 10 years later during litigation have to do with it? Well, I don't think there was an issue in the affidavits, but the reading on was almost an accidental reading on because everyone had intended that that be the conditional embodiment. It wasn't clear. You keep coming back to what their intent was. Why should we be looking at affidavits and testimony by experts interpreting the prosecution history? We have the prosecution history. We have to interpret it. Why should we be looking to this kind of extrinsic evidence about it? Because the first thing you have to do is you have to look at the language of the claims. And the language of the claims was using all the language of the conditional embodiment. They were talking about using two sensors. They were talking about selectively doing this. All the things that they were doing was the conditional embodiment. And the examiner himself allowed it on the basis that, and this is what Judge Robinson says, that he wasn't excluding an embodiment. He was just making minor wording changes. So I think when you read through that record, and that's without any extrinsic evidence whatsoever, you see exactly what was happening there. And then you see two years later that Dr. Mohler discovered, and this was right before they were going to do clinical trials, that that wasn't claimed. And then he came back and claimed it. Now everyone could now look at this claim as 15 and 16 and say, well, maybe if I interpret it very broadly and forget this language, I can do this. And that's what Judge Robinson did when she did that and said, there's no surrender here, because she reached the conclusion that there wasn't any surrender. And if you can see that the two embodiments were the antithesis of each other. In one, you had the weight. You had to have a natural pulse, weight, and if it doesn't come within a narrow window, then have another pulse. The unconditional was the antithesis of that. In the unconditional, once you got a natural pulse, you fired both. It was counterintuitive. And everyone was focused in on the conditional embodiment and the language that was said in the conditional embodiment when the examiner made his changes was conditional embodiment language. For example, he said, separately sensing cardiac signals from both left and right ventricles, stimulating at least one ventricle substantially simultaneous with the contraction of at least one other ventricle. This was language in the conditional embodiment that if you knew the unconditional embodiment, you could then come back and say, well, maybe it does read on it. But no one considered it that way here. Mr. Norshteyn, let me ask you, twice in your discussion with Judge Dyke, you referred to minor wording changes by the examiner. And you're correctly reflecting what's in the record. They are characterized there, I think, by the examiner or somebody during prosecution as minor wording changes. But does your case stand or fall on our agreement that those were minor wording changes? You go under your three-part test. And the last question is material, narrowed. And in this case, Judge Robinson specifically helped. I think she was correct that the unconditional embodiment has material, narrowed claims. So we don't rise and fall on that. So my sense is it's hard to really agree with the characterization that these were minor wording changes that resulted in the language that we see now in claims 15 and 16 with that critical clause at the end that reads, in the event. Well, they really were minor wording changes when you look at the language of the claims where they use the broad language from the conditional embodiment. And then if you look at it very carefully, you then say, even though it has this language in it, it's really the unconditional embodiment. But if you follow up on Judge Schall's question, that if we read this as these language changes as eliminating the unconditional embodiment and confining this to the conditional embodiment, they're not minor language changes, right? Well, Judge Robinson specifically. No, no. Well, sure. Yeah, OK. Sure. But Judge Robinson specifically said that wasn't the case. But that's what I'm saying. Assume for the moment that one takes the position that Judge Dyke just articulated, namely, this was not a minor wording change. What does that do or not do to your case? Well, still the claims are material and narrow. So under the three-part test, we would still survive. But I would differ very substantially with that because the examiner allowed the claims initially. And then he just had an interview in which no prior art was discussed. And then he says, I'm putting in minor wording changes. And he not only says that with respect to this claim, he says it with respect to a number of other claims. And I think that's the intent. The key thing would be here as to whether the claims were, in fact, being narrowed by the language changes. And I understand you, in response to Judge Shaw and to my questions, to agree that if the claims were, in fact, being narrowed by the amendment to eliminate the unconditional embodiment, that, in fact, they weren't minor language changes, that they were directed to patentability. Well, they could be directed to patentability because there's no discussion in the record concerning that. And these claims were already allowed in the first office action. And they were allowed with that breadth. And there was no suggestion. So the question is, if they were eliminating the unconditional embodiment by the language changes, they weren't minor changes, right? Well, certainly that would be the case. But all the evidence points that that wasn't the case. But let me ask you a minute. I understood you to be making the argument at some point. Maybe I misunderstood it in the briefs that, all right, even if this is a major language change, namely the insertion in the event language, nevertheless, recapture isn't implicated here because it wasn't necessary to overcome prior art. Certainly not. There wasn't any discussion of that. None of this had any application to the prior art. So you would be saying it's a mistake of some kind? No. Well, as I say, all that Judge Robinson did was— No, no. I'm saying about what happened during the prosecution, not Judge Robinson, but during the prosecution. As to the mistake? Yeah. Well, there wasn't a mistake. The best you could say is there was something accidental that you could take a claim that was clearly directed to the conditional embodiment, and now knowing about the unconditional embodiment, say, maybe I can read that on that. That just wasn't happening. And there wasn't any surrender, which is required under the court's law. And also there was— What if someone came to you, Mr. Neustadt, and said, gee, I don't see any reason for this major wording change in light of the prior art that was cited? What would you say? Would you say that's right or wrong? Well, that's wrong. He wasn't trying to put that language in to distinguish over anything. All that he was doing was taking— That's correct. That's correct. And I think the examiner was of that original opinion when he allowed the claims in the first action. It's just odd because it is very major language change. I have to agree with Judge Dyke. I don't think it was very language change because you had very broad language to begin when you said separately sensing cardiac signals from— I mean, it does seem to give Mr. Bass a good argument that it's very significant language that's inserted. I don't think so because how could Judge Robinson then find in her opinion that, yes, if I read 15 and 16, I can see that possibly they can cover, and then come to the conclusion that there's been no surrender here? She looked at that language very carefully and said that there was nothing other than what the examiner was saying, minor wording changes. But that's not quite true. On page 30 of her opinion, she says the examiner narrowed the claims to include immediate and unconditional pacing. So she viewed what the examiner did as having made a major change. No, she agreed later on in the opinion that this was a minor wording change and that she said the examiner, when he made this change, he was just putting in a minor wording change, not excluding an embodiment. She specifically said that in her opinion. I'm not sure I can find that for you right now, but she did exactly say that. It would be interesting to see where. I may be able to find it while my opposing counsel reads. I see my time has run up. Should I address the court's comment with respect to jurisdiction? Do you agree? Mr. Bass was urging an approach on this, and he says, I think that one alternative is to wait until the Supreme Court decides metamnium v. genente. Yeah, I do not believe that's an alternative, and that's being raised for the first time here today. Both parties agreed that there was jurisdiction under the reasonable apprehension standard. And there wasn't any question, because they stopped paying royalties, were not getting royalties, they only brought the GJ action because they knew that we would sue them if we didn't. So under the reasonable apprehension standard, there was no question at all. And this case really has no relation at all to metamnium. We're not getting royalties, we're ready to sue, there was reasonable apprehension. Thank you, Mr. Bass. Thank you, Your Honor. Two quick points. First, with respect to Mr. Bass. Bass, let me, I'm sorry to jump on you so quickly there, but time is fleeting, as you know. What would, what would, I'm going to ask you if I could, please, the same question I asked Mr. Neustadt. What if someone walked up to you and said, gee, Mr. Bass, I've looked at this prosecution history here and I see these major changes, these major language changes that were made that we now see in Claims 15 and 16. And I agree with you, Mr. Bass, that these are major wording changes. But I don't think those wording changes were necessary in view of the prior art that had been the subject of the discussions in the prosecution history. What would your response be to that question? In terms of how to do the prosecution? No, in terms of the recapture issue. Because obviously that person would be thinking in their head, hmm, a change was made that didn't have to be made in the light of the prior art, so there was a mistake here, so there's not a recapture bar. What would you say? Not meaning to evade your question, my answer depends on who I'm counsel for. I guess you're counsel for yourself, because someone's asking you the question. If I'm counsel for an outside party who has to proceed on a public record, I would say— Supposing you're answering the question in response to a question from some, what I'll call, a Socratic pest. Oh, the Socratic pest would clearly take the public perspective that we're taking from the case and find— But seriously, what would you say if someone basically said to you, look, a major wording change is yes, I agree with you, Mr. Bass, but it doesn't seem to me that it was a change that had to be made in light of the prior art that was being discussed, hence it seems to me it was a mistake. I submit that that view of the intrinsic evidence is untenable. Let me say why. If you look at the specification in the original patent, and I suggest most easily refer to column 7 beginning in line 33 of the reissue patent, there's this language. It is also contemplated that when a ventricular depolarization signal is sensed in one or the other of the ventricles, that a stimulating pulse may also be immediately delivered on an unconditional basis to both ventricles. That's column 7, line 33. That's column 7, line 33 of the reissue. Now, on its face, that is unambiguously clear, a statement of the unconditional mode of cardiac pacing. And if you went back to the original application, 15 and 16 embody that mode. They cover it, and Judge Robinson was plain right on that. Now, where Mr. Newstown, I think, is into a bit of, with respect to revisionist history, is to suggest everybody thought they were only proceeding on the conditional mode. It's not what Mr. Cone thought. It's plain from the extrinsic evidence that Mr. Cone was very clear from the beginning, and he's the one who drafted 15 and 16, that the very essence of Dr. Mower's invention was the unconditional embodiment. And yet, they want the court to believe that with skilled patent practitioners who knew this field, they prosecuted an application, knowing what the core of the invention was, and left the claims out? It's, we submit, totally untenable. Unless there are further questions from the court, we rest in peace. Thank you. We thank both counsel. We'll take the case under advisement. Your Honor, I found that one portion. It's in paragraph 20 of the judge's decision, at page 28, in which she said that the examiner thought he was clarifying the invention, not surrendering the body. This is paragraph 20, page 28. Thank you.